**In the Matter of Joseph H. SCOTT.**

**No. 97–253–M.P.**

Supreme Court of Rhode Island.

June 9, 1997.

David D. Curtin, Chief Disciplinary Counsel, for Petitioner.

Francis X. Flaherty, Warwick, for Respondent.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

PER CURIAM.

This disciplinary matter is before the court pursuant to a recommendation of the Supreme Court's Disciplinary Board (board) that the respondent, Joseph H. Scott, be disciplined as provided in Article III, Rule 3, of the Supreme Court Rules. Article III, Rule 6(d), provides:

"If the Board determines that a proceeding * * * should be concluded by public censure, suspension or disbarment, it shall submit its findings and recommendations, together with the entire record, to this Court. This Court shall review the record and enter an appropriate order."

The facts as found by the board, after hearing, are as follows. In January of 1988 Edgar and Roberta Clark (the Clarks) sold commercial real estate and were represented in that sale by respondent. They received substantial funds from the sale. Within that same month the Clarks met with respondent to consult regarding investment advice and investment opportunities. This request for advice set in motion a series of transactions that culminated in the instant disciplinary proceedings.

The first transaction took place between respondent and his clients. On January 12, 1988, he borrowed the sum of $25,000 from the Clarks. These funds constituted a portion of the proceeds from the above-noted sale. The terms of the loan required payment of principal plus interest in the amount

of 12 percent per annum and was payable within one year. The loan was secured by a mortgage on respondent's real estate. All documentation evidencing and securing the loan was prepared by respondent. The respondent did not advise the Clarks to seek independent professional advice prior to entering this agreement, nor did he discuss with them the conflicts of interest that could arise or be present in this type of transaction. This loan was repaid by respondent within the prescribed period.

The other transactions took place between the Clarks and other clients of respondent. On January 11, 1988, respondent arranged a loan from the Clarks to Howard J. Hayes (Hayes) and Joanne Dessaules (Dessaules). The respondent had previously represented Hayes and Dessaules in their purchase of commercial real estate and had procured title insurance on their behalf during the course of that prior representation. Hayes and Dessaules were seeking additional financing, and respondent represented the Clarks and Hayes and Dessaules in arranging a $60,000 loan between the parties. This loan also called for interest payments in the amount of 12 percent per annum, and the loan was secured by a second mortgage on real estate owned by Dessaules. The respondent represented all parties at the closing. He did not advise his clients about the possible conflicting interests between the parties. He also did not recommend or procure a policy of title insurance for this transaction.

On or about January 12, 1988, respondent arranged for a loan from the Clarks to Jo Ann Pelchat (Pelchat) in the amount of $30,000. The purpose of this loan was to provide financing for the purchase of residential property. The loan terms called for payment of principal and interest in the amount of 12 percent per annum payable over a period of five years. The respondent represented all parties at the closing of this real estate loan without advising them of the potential conflict of interest.

Shortly after these transactions were entered into, problems arose in respect to repayment of each of these loans. Regarding the loan to Hayes and Dessaules, payments remained current to the Clarks throughout 1988. In October of 1988 a payment of $30,000 was made to the Clarks by Hayes and Dessaules to reduce the principal balance of the loan. In December of 1988 a proposed sale of the property owned by Hayes and Dessaules, the proceeds of which would have paid off the Clarks' loan, was not completed when it was determined through a title search that a pre-existing right of first refusal benefiting a prior owner in the chain of title may not have been extinguished. This pre-existing right of first refusal was not discovered by respondent when he performed the original title search on behalf of Hayes and Dessaules. The proposed buyer of the property refused to conclude the sale, and Hayes and Dessaules subsequently ceased paying the required monthly payments to both the Clarks and the holder of a first mortgage on the property.

At that time respondent commenced making the monthly payments due on the mortgages to the holder of the first mortgage, and to the Clarks. The respondent had no legal obligation to make these payments. Rather he voluntarily assumed this obligation to protect the interests of Hayes, Dessaules, and the Clarks. Apparently respondent concluded that his negligence had caused the sale not to be consummated. Eventually respondent was incapable of meeting these obligations, and the holder of the first mortgage foreclosed on the property.

The Pelchat loan fared no better. Pelchat fell behind in her payments on the loan. As with the Hayes/Dessaules loan, respondent voluntarily made payment on Pelchat's behalf to the Clarks for a period of time, even though he was under no legal obligation to do so. In September of 1990, with the authorization of the Clarks, respondent commenced foreclosure proceedings against Pelchat. A foreclosure sale was scheduled to be held on March 1, 1991. However, on February 28, 1991, Pelchat filed a petition under chapter 13 of the United States Bankruptcy Code, causing an automatic stay of the foreclosure proceedings.

On March 1, 1991, after receiving notice of the stay, respondent voluntarily signed an unsecured promissory note obligating himself to make payments to the Clarks in the

amount of $60,000 plus annual interest in the amount of 8 percent in sixty equal monthly installments. The respondent determined that this was the amount that the Clarks had lost at that time on the investments that he had advised them to make. The respondent made payments on that note until 1994, when his financial liabilities precluded him from keeping current on those payments.

After signing the above-noted promissory note, respondent sought relief from the stay of the foreclosure in the Bankruptcy Court on behalf of the Clarks, but those efforts were unsuccessful. On November 26, 1991, respondent notified the trustee in bankruptcy that a proposed buyer for the Pelchat property had been found. The purchase-and-sale agreement provided that respondent would hold a first mortgage in the amount of $30,000 and that the purchase price of the property would be $45,000. This sale was approved by the Bankruptcy Court on January 7, 1992. The respondent offered the Clarks the opportunity to hold a mortgage on the property, but they declined. On March 23, 1992, the Clarks signed a document discharging their mortgage on the property, indicating that they had received full payment and satisfaction on the Pelchat mortgage. This statement was not true. The sale was concluded and the Clarks did not receive any proceeds from the sale in payment of their mortgage. A mortgage in the amount of $32,000 was recorded on the property after the sale in favor of Susan Scott, respondent's wife. This mortgage was paid off in full when the property was resold in 1993. The respondent did not inform the Clarks of the conflict of interest inherent in this transaction.

After the sale, Pelchat's chapter 13 bankruptcy proceeding, which had been converted to a proceeding under chapter 7 of the Bankruptcy Code, was concluded. The trustee in bankruptcy forwarded a check in the amount of $7,420.93 to respondent as attorney for Edgar and Roberta Clark. The respondent used a portion of these proceeds toward his payments to the Clarks under the promissory note and applied the remainder toward what he considered fees owed by the Clarks for his representation in the foreclosure and bankruptcy proceedings.

In 1994 respondent became delinquent in his payments to the Clarks under the promissory note of March 1, 1991. They have now retained their own counsel and are presently pursuing a civil action against respondent for damages. Additionally the instant disciplinary complaint was filed against him. The undisputed testimony is that respondent has expended approximately $120,000 of his own funds to rectify the problems caused by his faulty title search of the Dessaules real estate and the losses caused to the Clarks on the Hayes/Dessaules and the Pelchat loans.

Relying upon this evidence, the board concluded that respondent had violated Disciplinary Rules 5–101(A), 5–104(A), 5–105(B), and 5–105(C) of the Code of Professional Responsibility and Rules 1.7(b) and 1.8(a) of the Rules of Professional Conduct.[1] Rule 5–101(A) provides:

> "Except with the consent of his client after full disclosure a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

Disciplinary Rule 5–104(A) provides:

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

The board correctly concluded that respondent violated each of these rules when he borrowed money from his own clients. It is undisputed that he represented them as an attorney in the sale of a commercial property from which they realized a substantial profit.

---

1. The respondent's conduct spanned a period from January 1988 to 1994. At the time he entered into the loan agreement between himself and the Clarks and arranged the loans to Hayes and Dessaules and to Pelchat, the Code of Profes-sional Responsibility was in effect. On November 15, 1988, this court adopted the Rules of Professional Conduct. The Rules supersede the Code and apply to any conduct occurring on or after that date.

They turned to him as their legal advisor for advice on how to invest those funds. An attorney's interest in obtaining a loan from his client creates an inherent conflict that in all but the rarest of situations will impede the attorney's obligation to render independent professional advice to the client. Here, even though the loan terms appear fair and reasonable and respondent made full payment under those loan terms, he failed to advise his clients properly in respect to the potential conflicts and to obtain their informed consent. That lack of disclosure and informed consent is dispositive under these rules.

Additionally respondent's representation of all parties to the loan transactions between the Clarks and Hayes and Dessaules and between the Clarks and Pelchat, without full disclosure and consent, violates Disciplinary Rules 5–105(B) and 5–105(C). Those rules provide:

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

"(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

The respondent represented both the borrower and the private lender in two separate transactions. The interests of each party in the transactions may be significantly different. Even though the terms of the loan may have been acceptable to and readily agreed upon by the parties, respondent had an obligation to advise each of the parties of the possible conflicts and to obtain their informed consent to his dual representation. This he failed to do.

The respondent compounded his errors in his attempts to salvage the failing loan agreements. By assuming personal responsibility to make the payments on the Hayes/Dessaules loan and continuing to represent all the parties to that transaction, respondent violated Rule 1.7(b) of the Rules of Professional Conduct. Rule 1.7(b) provides, in pertinent part:

"A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation."

The respondent did not inform his clients of their conflicting interests, or advise each client that he or she had the right to independent counsel, or even undertake an inquiry concerning whether his representation of any of the clients would be adversely affected by either his representation of another or his own business interests.

The board also concluded that respondent had violated Rule 1.8(a) of the Rules of Professional Conduct when he obtained a mortgage on the Pelchat property in favor of his spouse incident to the sale of the real estate. Rule 1.8(a) provides in pertinent part:

"A lawyer shall not * * * knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto."

In effect Rule 1.8(a) erects three requirements that an attorney must satisfy prior to obtaining a security interest adverse to a client. Here respondent obtained a security

interest in the property formerly owned by Pelchat. This security interest was obtained after the Clarks had released their mortgage to effectuate the sale. Even though this form of security interest may have facilitated the closing, it was adverse to the interests of the Clarks because respondent's wife became the secured creditor, not the Clarks. The full effects of this conflict were realized when the property was resold, respondent's wife received payment of the mortgage amount, and the Clarks received none of these funds. The respondent did not satisfy any of the requirements of Rule 1.8(a) prior to obtaining the security interest in the property.

Relying upon these facts and having concluded that respondent had violated each of the rules delineated above, the board recommended that respondent be publicly censured. Although this court will give deference to recommendations of the board, we are not bound by those recommendations. However, our review of the entire record supports the recommendation of the board.

It must be stressed that respondent did not intend to engage in conduct that would harm his clients' interests. In each transaction in which he represented the Clarks, he believed that the terms of the transactions were fair and reasonable to his clients. Indeed, when each transaction did not work out as intended, respondent voluntarily assumed a duty to rectify the situation and to reimburse the Clarks for their losses. His attempts at rectification were not wholly successful but nonetheless were well motivated.

The respondent has incurred extraordinary personal expense in his efforts to resolve these problems. He has voluntarily paid over $120,000 of his own funds, prior to the commencement of any civil litigation or the filing of a disciplinary complaint, to extricate the Clarks from the results of his investment advice.

While we commend the respondent for his efforts to remedy his mistakes, we cannot condone his violation of the rules of professional conduct. The respondent has clearly violated his ethical obligations. In fashioning an appropriate sanction for that misconduct, we believe it must be clear that the purposes of discipline are not punishment of the attorney but protecting the public and maintaining the integrity of the profession. Those dual purposes of discipline can best be met in these circumstances by the imposition of public censure rather than suspension. Accordingly, the respondent, Joseph H. Scott, is hereby publicly censured.

GOLDBERG, J., did not participate.