**In the Matter of Dennis H. RICCI.**

**No. 99–315–MP.**

Supreme Court of Rhode Island.

Aug. 19, 1999.

---

David Curtin, Chief Disciplinary Counsel, for petitioner.

Susan Carlin/Stephen R. Famiglietti, Providence, for respondent.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

This disciplinary matter comes before us pursuant to the provisions of Article III, Rule 6(d), of the Supreme Court Rules of Disciplinary Procedure. The Disciplinary Board of the Supreme Court (board) has forwarded its recommendation that the respondent, Dennis H. Ricci, be suspended from the practice of law. The respondent appeared before the Court pursuant to an order directing him to show cause why the disciplinary sanction recommended by the board should not be imposed. After consideration of the findings and recommendations of the board and the arguments presented by the respondent, it is the opinion of this Court that cause has not been shown and that professional discipline is warranted.

The material facts supporting the board's recommendation arise from the respondent's representation of four clients in personal injury cases and his handling of settlement funds received on their behalf. The board conducted hearings on formal charges brought against the respondent subsequent to an investigation by this Court's Disciplinary Counsel (counsel). Those hearings consisted of four days of trial testimony as well as the submission of written memoranda to the board by the parties. The board has transmitted the entire record to this Court for its review. We set forth the pertinent facts below.

In February 1993, Vicky Tui (Tui) was involved in a motor vehicle accident which resulted in her receiving personal injuries and incurring medical bills for treatment of those injuries. She retained the services of respondent to represent her in a claim for damages as a result of that accident. She was referred to respondent by her boyfriend, John Correia.

The respondent negotiated a settlement of the personal injury claim with the insurance carrier of the other driver involved in the accident. On October 10, 1995, he received a settlement check in the amount of $18,000 in settlement of that claim. When those funds were received, respondent deposited the settlement check in a business account which he used for both business and personal use. He did not deposit the settlement check into a separate client or trust account. Indeed, respondent acknowledged that he had never maintained a separate account for the protection of client funds, even though he has been a member of the bar since 1980.

Ten days after the receipt of the settlement funds, respondent paid Tui her portion of the settlement proceeds, after making deductions for the payment of medical bills incurred by Tui. The payment to Tui was drawn from a different account in which respondent maintained client, business, and personal funds, and not the account into which the settlement funds had been deposited. The respondent did not maintain sufficient funds in either account to pay Tui's medical bills.

The respondent did not promptly make payment of the deducted sums of money to Tui's health care providers. On January 17, 1996, respondent did make one unprompted payment to one provider on her behalf. On February 1, 1996, one of Tui's treating physicians, Dr. Izzi, filed a complaint against respondent with counsel regarding respondent's failure to forward payment. That complaint led to an investigation by counsel which led to the discovery of the incidents set forth below.

On February 15, 1996, after receiving notice of Dr. Izzi's complaint, respondent forwarded a compromised payment to Dr. Izzi in settlement of Tui's medical bills. The respondent did not forward payment to Tui's other health care providers until September 1996 after the investigation by counsel had commenced.

The respondent also represented Joaquim and Dilia Correia, husband and wife, who were injured in a motor vehicle accident occurring in Connecticut in May 1994. The Correias are the parents of John Correia, the boyfriend of Tui.

The Correias were insured under an insurance policy issued by American International Insurance Company (American International). The operator of the other vehicle involved in the motor vehicle collision was insured through Nationwide Insurance (Nationwide). Under the provisions of the Correias' insurance policy with American International, they were entitled to receive payments for medical expenses they incurred as a result of a motor vehicle accident (med-pay). The respondent submitted a claim to American International pursuant to the med-pay provisions of their policy. The respondent did not inform the Correias that he was submitting a med-pay claim on their behalf.

In April 1995 respondent received med-pay benefits from American International on behalf of Mrs. Correia in the amount of $3,755.48 and $4,777.12 on behalf of Mr. Correia. The respondent did not notify the Correias that he had received those funds, and deposited them into his business account. He did not make payment to any health care provider on behalf of the Correias from those med-pay funds. Those funds did not remain in that account.

In August 1995 respondent negotiated a settlement with Nationwide on behalf of Mrs. Correia in the amount of $15,400 and on behalf of Mr. Correia in the amount of $17,500. Upon receipt those funds were deposited into one of respondent's all purpose business accounts. The respondent subsequently disbursed to the Correias their portion of the settlement funds, after making deductions for his attorney fee and withholding sums to make payment to their treating health care providers. However, those payments were not made to those providers until September 1996 when counsel's investigation was underway, and respondent did not retain sufficient funds in his account to pay the Correia's medical bills.

Upon being made aware of the settlement between the Correias and Nationwide, American International contacted respondent regarding a possible right of subrogation to be reimbursed for the medical payments previously forwarded to him. The respondent did not notify the Correias of the subrogation claim, nor did he forward payments to American International. Parenthetically, American International did not pursue the subrogation claim. However, during the course of counsel's investigation, respondent forwarded to American International the full amount of the med-pay funds he had received. The respondent made these payments to American International without the knowledge or consent of his clients, and without a specific demand by American International.[1]

The misfortunes of the Correia family continued when John Correia (John) was involved in a motor vehicle accident in December 1994 which also resulted in personal injuries. John also retained respondent to represent him in his claim for damages arising from that accident. John was insured through American International, and the other party to the accident was insured through Progressive Insurance (Progressive).

John incurred medical expenses for treatment of his injuries, and American International made payments on his behalf to his health care providers in the amount of $3,239. On August 1, 1995, just prior to reaching a negotiated settlement with Progressive, respondent reached an agreement with American International whereby American International would accept the sum of $2,159 as full settlement of their claim for reimbursement of the previously paid medical bills. However, respondent did not notify John of this agreement.

1. The respondent subsequently obtained a partial payment back from American International, who apparently determined they were either not entitled to subrogation or decided not to assert a claim. Those funds were returned to respondent who made an appropriate distribution to the Correias.

On August 9, 1995, respondent received a settlement check in the amount of $13,200 from Progressive, which he deposited into an all purpose business account. From that sum he deducted his attorney fee and an amount to pay American International the full amount (not the compromised amount) of their claim, and forwarded to John the amount he believed he was due. However, respondent did not make any payment to American International until September 13, 1996, after the investigation by counsel was underway. At that time he forwarded the compromised amount. Twelve days later he forwarded the difference to John.

The board determined that the total amount of funds improperly handled by respondent in his representation of the four clients was $29,194.14. These funds were improperly held in an all purpose business account rather than a properly segregated client or trust account. A review of the relevant banking records reveals that these funds did not remain on deposit, and were used by respondent. The respondent did eventually deliver all funds due to the appropriate parties, but not until after he was under active investigation by the office of Disciplinary Counsel.

The board charged respondent with violations of Article V, Rules 1.3, 1.15(a), (b), (c) and (d) and 8.4(c) of the Supreme Court Rules of Professional Conduct. Prior to the commencement of the hearing, respondent admitted to violating Rules 1.3 and 1.15(a), (b) and (d), but denied the allegations that he had violated Rules 1.15(c) and 8.4(c). However, by the conclusion of the disciplinary proceedings before the board he acknowledged those violations as well.

Rule 1.3 requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." When respondent withheld funds from his client's settlement for the payment of medical bills, he became obligated to make prompt payment to the health care providers. The record reveals periods of inexcusable delay between respondent's receipt of those funds and payment to those parties entitled to be paid. While no client was actually harmed by delay in payment, they remained at risk for claims that the medical providers could have asserted. A lack of actual harm to the client does not excuse an attorney's obligation to comply with Rule 1.3. *In the Matter of Watt*, 701 A.2d 319, 320 (R.I.1997).

Rule 1.15 contains a comprehensive set of regulations governing an attorney's fiduciary duty to safeguard client funds. The pertinent parts of that rule, as relevant to these proceedings, are as follows:

"**Rule 1.15. Safekeeping property.**— (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of seven (7) years after termination of the representation as provided under Rule 1.16.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third persons, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another

person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

(d) A lawyer or law firm shall, subject to paragraph (f) of this Rule, deposit clients' funds, which are nominal in amount or to be held for a short period of time, in one or more interest bearing trust accounts ***."

■ Rule 1.15(a) requires an attorney to segregate client funds and the funds of third parties in a separate client account. The respondent utterly failed to comply with this rule. He commingled client funds and the funds properly belonging to third parties with his business and personal funds. During his testimony, he acknowledged that in his almost twenty years as a member of the bar he had never maintained a separate client account. We note that while Rule 1.15 was adopted by this Court effective November 15, 1988, an attorney's obligation to maintain a separate client account pre-dates the adoption of the Rules of Professional Conduct, and was required under the prior Code of Professional Responsibility by DR 9–102. That code was adopted by this Court in 1972. It is inexcusable for any practicing attorney who handles client funds to ignore such a long standing ethical obligation.

This failure to maintain a separate client account is also a violation of Rule 1.15(d). Pursuant to that rule, an attorney is obligated to deposit client funds which are nominal in amount or to be held for a short period of time in an interest bearing trust account. Interest paid on these client funds supports the Rhode Island Bar Foundation, which assists in providing legal services to the poor of Rhode Island; improving the delivery of legal services; promoting knowledge and awareness of the law; and improving the administration of justice. While an attorney may elect not to deposit client's funds in an interest bearing account, they must "opt out" by notifying the Clerk of the Supreme Court of this election each year.

■ Rule 1.15(b) requires prompt delivery of funds in a lawyers possession to those parties entitled to receive those funds. The respondent failed to abide by this obligation when he withheld those funds due to his clients' health care providers with no justifiable excuse. The respondent delayed payment of those funds for periods exceeding one year.

■ The respondent's commingling of his attorney fee portion of the settlement with the funds earmarked for payment of the clients medical bills violated Rule 1.15(c) as well.

■ The record clearly established that respondent failed to maintain funds belonging to his clients in the accounts in which they had been deposited, and that those funds were used by respondent for purposes unrelated to his clients. Clearly, respondent converted funds belonging to his clients to his own use. Rule 8.4(c) provides that it is professional misconduct for a lawyer "to engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" This Court has consistently determined that conversion of client funds is dishonest conduct as prohibited by this rule. *In the Matter of Hodge,* 676 A.2d 1362, 1363 (R.I.1996); *In the Matter of Krause,* 676 A.2d 1340, 1342 (R.I.1996). Accordingly, we agree with the finding of the board that respondent violated Rule 8.4(c).

■ The purpose of professional discipline is to protect the public and to maintain the integrity of the profession. *In the Matter of Scott,* 694 A.2d 732, 736 (R.I. 1997). In determining the appropriate level of discipline to impose, the board and this Court must weigh those factors which serve to aggravate and to mitigate the attorney's conduct. *In the Matter of Fish-*

*bein,* 701 A.2d 1018, 1020 (R.I.1997). The respondent presented evidence to the board that he had been involved in a motorcycle accident in 1993, which resulted in personal injuries causing him to have difficulty focusing on his professional obligations. However, those medical problems were essentially resolved by the time of the misconduct at issue. Additionally, the board found respondent's argument that there was no actual conversion of client property because he had other sources of funds available to pay the medical bills to be unpersuasive. Moreover, the board determined that respondent's mitigation testimony could more accurately be described as "justification, obfuscation, and refutation." Accordingly, the board found no mitigating factors which would warrant the imposition of a sanction less than suspension.

The board concluded, and we agree, that the primary cause of respondent's misuse of client funds can be traced to excessive gambling. The evidence adduced at the hearing established that respondent had incurred significant gambling losses which, more than any other factor, adversely impacted upon his representation of his clients, and was the root cause of his failure to abide by minimum ethical standards.

■ It is the recommendation of the Disciplinary Board that the respondent be suspended from the practice of law for at least one year and that the respondent must provide competent evidence that his gambling problem has remained under control as a pre-condition to reinstatement. We agree. Accordingly, the respondent, Dennis H. Ricci, is suspended from the practice of law for a minimum of one year, commencing thirty days from the date of this opinion. At the conclusion of this period of suspension, he may apply for reinstatement to the practice of law in accordance with Article III, Rule 16 of the Supreme Court Rules of Disciplinary Procedure, with the additional requirement that upon application for reinstatement he submit adequate proof to this Court that he has control over his gambling and his readmission would not be detrimental to the interests of the public.