Thomas R. DiLUGLIO

v.

**PROVIDENCE AUTO BODY,
INC. et al.**

Nos. 97–285–Appeal, 98–274–Appeal.

Supreme Court of Rhode Island.

June 30, 2000.

Julius C. Michaelson, Jeffrey S. Michaelson, Samuel E. Zurier, Providence, for Plaintiff.

Lauren E. Jones, David A Schechter, Providence, for Defendants.

Present WEISBERGER, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

An attorney, plaintiff Thomas R. DiLuglio (DiLuglio), and a businessman, defendant John H. Petrarca (Petrarca), formerly the co-owners of defendant Providence Auto Body, Inc. (PAB), and Waldlum Realty, Inc. (Waldlum), are here on cross-appeals from an amended judgment entered by the Superior Court. Sitting without a jury, a trial justice adjudicated their respective claims and defenses, including DiLuglio's request for PAB's dissolution and Petrarca's election to purchase DiLuglio's 20 percent minority-shareholder position in PAB. With the help of a special master, the court fixed the purchase price and interest thereon for Petrarca's buyout of DiLuglio's PAB shares. On appeal, both sides find fault with various aspects of the trial justice's decisions and rulings in this case. After reviewing these contentions, we affirm in part and reverse in part, for the reasons adduced below.

### Issues on Appeal

The defendants Petrarca and PAB contend that the trial justice erred when she refused to void the transactions whereby DiLuglio became a minority shareholder—first in Waldlum and then in PAB. Positing that DiLuglio acted both in his legal capacity and as an investor in the corporations that Petrarca controlled, defendants argue that DiLuglio breached his fiduciary obligations by failing to disclose to Petrarca the existing and potential conflicts of interest that inhered in DiLuglio's providing legal advice and performing legal work in connection with the very same transactions whereby he acquired an ownership interest in these businesses. Petrarca and PAB also suggest that DiLuglio's PAB shareholder status should have been voided because DiLuglio failed to obtain Petrarca's informed written consent to serving both as his lawyer and as a minority shareholder in the corporation that owned all of PAB's stock. They next challenge the trial justice's failure to discount the value of

DiLuglio's shares in PAB because of their relative lack of marketability and lack of controlling status. Finally, defendants question the trial justice's decision to add compound interest to the purchase price of DiLuglio's minority equity holding in PAB.

DiLuglio's cross-appeal, on the other hand, takes the trial justice to task for rejecting his misrepresentation, misappropriation, and other misconduct claims against Petrarca and PAB without giving him the opportunity to submit evidence on the merits of these assertions and in violation of an alleged oral agreement to address these claims at a later court hearing. DiLuglio also suggests that the trial justice erred in allowing Petrarca to purchase his PAB shares for their fair value when Petrarca's election to do so was conditioned and qualified in ways that the applicable election statute did not permit. Finally, DiLuglio contends that Petrarca's election to purchase his PAB shares was untimely and that the trial justice erred in refusing to award him interest on the purchase price of his PAB stock from the date he filed his dissolution claim. Before resolving each of these issues, however, we pause to review the factual background that led to this long-running legal rumpus and the applicable standard of review that we follow in cases of this kind.

## Facts and Travel

In 1969 Petrarca hired DiLuglio as his attorney to defend him against federal criminal charges in connection with the alleged theft of a stereo system. DiLuglio succeeded in getting those charges dismissed in 1970 and, in the warm afterglow of that successful result, Petrarca believed that their personal relationship blossomed. Indeed, Petrarca contended that DiLuglio not only became friendly with him, but, from his perspective, they entered into a close and trusting relationship with each other over the next twelve years. DiLuglio, however, sharply disputed this characterization of their association. In any event, Petrarca and DiLuglio certainly remained in contact with each other during these intervening years, although DiLuglio never formally represented Petrarca in any other legal matter from 1970 to 1982.

Nevertheless, on a few occasions during this twelve-year interlude, Petrarca found himself needing legal assistance. In these instances, he initially sought out DiLuglio for his advice and counsel. DiLuglio, whose "kind of practice * * * [involved] lots of corporate advice as far as acquisition of property and selling of properties and businesses," ultimately referred these legal matters to as many as three separate attorneys, including his son, Thomas A. DiLuglio. Moreover, from January 1977 through January 1985 DiLuglio served as the Lieutenant Governor of Rhode Island.

In 1982, Petrarca decided to leave Dean Auto Body, his former partnership, and he began to operate his own auto-repair shop out of a friend's house. He soon began looking for a new and better site for this business. Petrarca again sought out DiLuglio's advice about how he should proceed to accomplish his objective. Together they visited a potential business site in East Providence, and DiLuglio haggled with the owner over a down payment for the property. The negotiations collapsed, however, after DiLuglio and Richard Tallo (Tallo)—an attorney who shared office space with and received legal-work referrals from DiLuglio—flushed out an easement on the property that rendered its prospective purchase too problematic for them to pursue further.

Later that year, Petrarca located another potential site on Silver Spring Street in Providence (the property). This real estate constituted the sole asset of Waldlum, a corporation owned by Paul and Sylvia Waldman. Unfortunately for Petrarca, he could not obtain the financing he needed to consummate this purchase. When DiLuglio learned that Petrarca needed money to acquire the property, he provided $25,000 to Petrarca. Petrarca would eventually claim that this $25,000 was simply a loan. DiLuglio, on the other hand, contended

that these funds constituted his own start-up-capital investment in both the property and in PAB, Petrarca's soon-to-be-formed corporation for his auto-body business.

DiLuglio also orchestrated the somewhat convoluted means used to acquire the property.[1] To preserve the existing mortgage financing on the property, the Waldmans agreed to transfer all their stock in Waldlum, rather than having Waldlum simply sell the property itself. To keep Petrarca's creditors at bay, DiLuglio suggested that Petrarca's parents serve as the nominal buyers of Waldlum's stock. In exchange for a payment that exceeded the $25,000 DiLuglio had provided to Petrarca, the Waldmans assigned all 1,000 shares of Waldlum's outstanding stock to Petrarca's parents. Tallo testified at trial that, at DiLuglio's request, he performed the title work on the property, searched the UCC filings, and represented Petrarca and his parents at the October 1982 closing to purchase Waldlum's stock from the Waldmans, but he could not recall any more specific details of that closing. DiLuglio testified that he had "asked * * * Tallo to communicate to [Petrarca] the fact that [he] was willing to invest $25,000 in return for 20 percent of the stock [in Waldlum]. John [Petrarca then] came over to me and said 'Hey, I'm happy to have you as a partner.'"[2] Tallo, on the other hand, disclaimed any knowledge about DiLuglio's claimed ownership or investment interest in Waldlum. As far as Tallo knew, Petrarca was the sole beneficial owner of Waldlum, and Tallo played no role whatsoever in communicating any arrangements or understandings between Petrarca and DiLuglio vis-à-vis their re-spective ownership claims to Waldlum and PAB. In any event, nothing in writing documented any alleged agreement between Petrarca and DiLuglio concerning DiLuglio's $25,000 and whether it was intended to be a loan or an investment, nor did they otherwise memorialize the terms of their business relationship.

Nevertheless, it was DiLuglio who negotiated for and structured the acquisition of Waldlum's shares and who organized the ownership of both Waldlum and PAB. Most significantly, he incorporated PAB and then set it up as a wholly owned subsidiary of Waldlum. DiLuglio also arranged for the Waldmans to assign all of Waldlum's 1,000 outstanding shares to Peter and Gina Petrarca, Petrarca's parents. DiLuglio prepared whatever legal paperwork was required to accomplish this assignment. In December 1982, he then incorporated PAB and prepared and filed its articles of incorporation. Later that month he arranged for Petrarca's parents to assign 200 of Waldlum's 1,000 shares to himself and he prepared the documentation to memorialize this transfer. Thereafter, in early 1983, Petrarca's parents used DiLuglio's assignment documentation to transfer their remaining 800 Waldlum shares to their son. DiLuglio also obtained fictitious business names for PAB's automobile leasing and sales divisions, and he prepared annual corporate report forms to reflect that Petrarca was PAB's president. Thus, DiLuglio structured the Waldlum stock acquisition such that he not only became a 20 percent shareholder of Waldlum, but he also became, indirectly, a 20 percent shareholder of PAB because he caused PAB to come into its corporate

1. This fact, as well as many others relating to the parties' dealings with one another, remained in considerable dispute during the trial. DiLuglio attempted at trial and in his brief to this Court to disclaim any notion that he had acted as an attorney for Petrarca in connection with the Waldlum stock acquisition and PAB's startup operations, whereas Petrarca attempted to characterize these and all the remaining actions that DiLuglio took in this regard as those of his attorney.

2. DiLuglio also said he donated a vehicle to the corporation and paid Waldlum's first monthly mortgage payment on the real estate. According to DiLuglio's valuation expert, DiLuglio contributed in total 41.8 percent of the initial out-of-pocket capital costs of $68,800 that Petrarca needed to acquire Waldlum's stock and to begin operating PAB.

existence as Waldlum's wholly owned subsidiary.[3]

PAB prospered and, in 1986, with the help of its accountant and tax attorney, it arranged to become a "Subchapter S" corporation[4] to avoid paying a separate corporate tax on its income. But for PAB to take advantage of this favorable tax treatment, Waldlum had to divest itself of its PAB stock. Thus, Waldlum transferred 80 percent of its PAB shares to Petrarca and 20 percent of those shares to DiLuglio. Waldlum then became a partnership (Waldlum Realty) and ceased its separate corporate existence. DiLuglio prepared a new deed to the Silver Spring Street property that Petrarca signed on Waldlum's behalf. The deed transferred ownership of the property from Waldlum to DiLuglio and Petrarca, and it showed that DiLuglio owned 20 percent and Petrarca owned 80 percent of the property as tenants in common. At trial, however, Petrarca denied any understanding that, as a part of changing PAB to a "Subchapter S" corporation, DiLuglio thereby became a direct 20 percent owner of PAB.

During his trial testimony DiLuglio admitted to serving as PAB's corporate counsel after he left public office in 1985, and to handling several different legal matters for PAB. And in 1988, after PAB had enjoyed substantial financial success, DiLuglio said he requested that PAB pay him more than the $200–$250 per week in income that he previously had been receiving from PAB. DiLuglio had noticed that Petrarca was drawing a salary from PAB that exceeded $200,000 per annum; as a result, DiLuglio demanded that PAB distribute more of PAB's profits to him. Petrarca not only denied that request, but he also asserted that DiLuglio was neither his co-shareholder in PAB nor was he a co-owner of the underlying real estate. After settlement negotiations proved bootless, DiLuglio filed suit in Superior Court.

In his complaint, DiLuglio sought dissolution of PAB under G.L.1956 § 7–1.1–90, arguing, among other things, that Petrarca had breached his fiduciary duty to DiLuglio, that Petrarca had paid himself excessive salaries, had denied DiLuglio access to corporate books and records, and had misappropriated and improperly diverted corporate assets for his own benefit.[5] In their defense, Petrarca and PAB asserted that DiLuglio merely had loaned money to them and that therefore he should not be recognized as a PAB shareholder at all. Alternatively, they argued that DiLuglio

---

3. On three occasions during the first three years of PAB's existence, DiLuglio lent money to PAB. He charged no interest on these loans, all of which PAB eventually repaid. In 1985, Petrarca added DiLuglio to PAB's payroll, and DiLuglio began receiving $200 per week. Eventually PAB increased these payments to $250 per week. The purpose of these payments, however, was also sharply disputed throughout this litigation.

4. An "S" corporation is a preexisting, closely held corporation that elects to be taxed under Subchapter S of the Internal Revenue Code. See 26 U.S.C.A. §§ 1361 through 1379. Generally, once the Internal Revenue Service grants this special tax designation to a corporation, the "Subchapter S" corporation's income "is not taxed at the corporate level but is passed through and taxed to its shareholders, in a similar fashion as a partnership." 18 Am.Jur.2d Corporations § 40 (1985). The primary advantage of a "Subchapter S" corporation is the avoidance of double taxation on both individual shareholder and corporate income. Although the "Subchapter S" corporation avoids paying income tax on corporate net income, the individual shareholders are taxed on the income they derive from the corporation, including any salaries and dividends. Thus, certain income, deductions, and losses pass through a "Subchapter S" corporation to the individual tax returns of each shareholder. See id. In order to qualify for "Subchapter S" status, the corporation must meet certain requirements: (1) it must be a domestic corporation; (2) it must be an eligible corporation; (3) it must have no more than a specified number of shareholders; (4) all its shareholders must be individuals or qualified estates or trusts; (5) no shareholders may be nonresident aliens; (6) it must have no more than one class of stock. See id.

5. DiLuglio also sought the appointment of a receiver, an injunction to prevent further alleged misappropriation of funds, and an accounting.

was not the rightful owner of any PAB shares because, as Petrarca's attorney, DiLuglio had failed to disclose fully and in writing the ramifications of DiLuglio's entering into these business transactions with Petrarca while DiLuglio was also performing legal work on Petrarca's behalf. They contended that DiLuglio had breached his fiduciary obligations to Petrarca by failing to reduce their alleged agreements and his purported consent to writing and by failing to notify Petrarca that he should seek independent legal advice concerning his business arrangements and transactions with DiLuglio.

After a bench trial, the trial justice found that no attorney-client relationship existed between DiLuglio and Petrarca for purposes of the Waldlum stock acquisition and PAB's incorporation. She further ruled that it was unclear from the record that Petrarca had misappropriated or wasted assets or that he had acted in any illegal manner. Instead, the trial justice found that Petrarca's actions in running PAB's business all fell within his business judgment as PAB's sole director and president. On appeal, DiLuglio challenges this ruling, asserting that the parties' attorneys and the trial justice had orally agreed that all DiLuglio's claims concerning Petrarca's waste, fraud, nondisclosure of corporate books and records, and mismanagement of PAB would be postponed to a second phase of the trial after the court had ruled on whether DiLuglio was in fact a PAB shareholder and, if so, on what terms Petrarca would purchase those shares. Instead, he asserts, the trial justice violated his due process rights by deciding these issues at the end of what he thought was only the first phase of the trial and after

agreeing that these other matters would be adjudicated at a later time.

In her decision, the trial justice ruled that, at all times material to this case, DiLuglio was indeed a shareholder, that defendants were not entitled to void that interest, and that, given PAB's status as an ongoing successful business, dissolution was too drastic a measure as a remedy for the parties' inability to continue as co-owners of PAB. Instead, noting Petrarca's 1992 filing of an election to purchase DiLuglio's PAB shares,[6] she ordered Petrarca to do so by paying to DiLuglio an amount equal to the shares' fair value as of the date in 1989 that DiLuglio had filed his claim for dissolution. She then appointed a special master to value DiLuglio's PAB stock. After conducting an extensive financial analysis, the special master valued all of PAB's stock at $874,000 and DiLuglio's 20 percent interest at $174,800 as of February 7, 1989, the date DiLuglio had filed his dissolution complaint. On January 13, 1997, the trial justice adopted these recommendations and concluded, over Petrarca's objection, that neither a minority discount nor a lack-of-marketability discount should be applied to the special master's valuation of DiLuglio's shares. Petrarca challenges this ruling on appeal.

After conducting an evidentiary hearing on the addition of interest to the evaluated purchase price of DiLuglio's PAB shares, the Superior Court entered a final judgment on March 31, 1997, and then, on April 30, 1997, entered an amended final judgment. The judgment awarded interest on the $174,800 purchase price at the rate of 12 percent,[7] compounded annually, running from February 7, 1989, when DiLuglio first filed his claim for dissolution.

6. In 1992, three years after DiLuglio filed his 1989 complaint, Petrarca filed an election to purchase DiLuglio's PAB shares in the event that the court found that DiLuglio was indeed a PAB shareholder, a fact that Petrarca and PAB denied. Apparently the trial justice overlooked this filing when she initially ordered *both* Petrarca and PAB to purchase DiLuglio's PAB shares pursuant to G.L.1956 § 7–1.1–90.1. The trial justice, however, later

amended her order, holding that § 7–1.1–90.1 authorized only the shareholder-defendant (Petrarca) to buy out DiLuglio's interest in PAB. *See infra* at n.21.

7. The trial justice used the corporation's borrowing rate at the date of valuation in determining a twelve-percent interest rate.

After the entry of this amended final judgment, Petrarca and PAB moved again to correct the judgment. Invoking Rule 60(a) of the Superior Court Rules of Civil Procedure, they argued that, under § 7–1.1–90.1, the award of interest on the purchase price should have commenced as of April 9, 1992, the date of Petrarca's election to purchase DiLuglio's shares, instead of on February 7, 1989, when DiLuglio filed his claim for dissolution. The trial justice agreed and again amended the judgment to reflect this change. In so doing, the trial justice lopped off more than three years' worth of interest from the judgment, but she retained the master's appraised value of DiLuglio's shares and the effective share-appraisal date as of February 7, 1989. DiLuglio also challenges the propriety of this decision as part of his appeal.

Additional facts will be discussed as needed to resolve the issues presented by the parties' respective appeals.

### Standard of Review

■ The findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless they are clearly wrong or unless the trial justice misconceived or overlooked material evidence. *See Nisenzon v. Sadowski,* 689 A.2d 1037, 1042 (R.I.1997). We have also held, however, that we will refrain from giving that same deference to a trial justice's factual findings in situations where the trial justice has erroneously excluded or ignored relevant evidence

that, when it is duly considered, "compels a different result." *Caranci v. Howard,* 708 A.2d 1321, 1326 (R.I.1998).

## I

### Petrarca's and PAB's Appeal

A. *The Existence of an Attorney–Client Relationship*

■ Petrarca and PAB argue that the trial justice overlooked or misconceived material evidence that established the existence of an attorney-client relationship between DiLuglio and Petrarca for purposes of the transactions whereby DiLuglio became a stockholder in Waldlum and then in PAB. They further assert that, even if the trial justice did not err in finding no attorney-client relationship with Petrarca in connection with these transactions, ample evidence supported the existence of an "ongoing" and continuing attorney-client relationship between Petrarca and DiLuglio—one that, at all times material to this case, subjected DiLuglio to the professional duties and responsibilities that lawyers owed to their clients [8] as outlined in Disciplinary Rule 5–104(A) of the then-existing Code of Professional Responsibility of the Supreme Court Disciplinary Rules.[9] Furthermore, defendants assert that because DiLuglio breached his applicable fiduciary and professional duties in connection with performing such legal work, the de facto corporate co-ownership arrangement between DiLuglio and Petrarca should have

8. The acquisition of Waldlum's stock occurred in the fall of 1982. At that time, which is also when DiLuglio, Petrarca, Waldlum, and PAB entered into various transactions with one another that led to DiLuglio's acquiring 20 percent of Waldlum's stock and to PAB's incorporation as a Waldlum subsidiary, the Code of Professional Responsibility was in effect. On November 15, 1988, this Court adopted its version of the American Bar Association's Model Rules of Professional Conduct. "The Rules supersede the Code and apply to any conduct occurring on or after that date." *In the Matter of Scott,* 694 A.2d 732, 734 n. 1 (R.I.1997).

9. The then-applicable Code of Professional Responsibility of the Supreme Court Disciplinary Rules, DR 5–104(A), provided, in pertinent part, as follows:

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

been considered voidable at the election of defendants at any time thereafter.

We note at the outset that the existence of an attorney-client relationship is a question of fact. *See State v. Austin,* 462 A.2d 359, 362 (R.I.1983). And because defendants have asserted the existence of an attorney-client relationship as an affirmative defense to void DiLuglio's acquisition of stock in Waldlum and then in PAB, it was their burden to prove the existence of any such relationship. *See Clark v. Bowler,* 623 A.2d 27, 29 (R.I.1993) (holding that a party seeking to impose a constructive trust based on a claim of fiduciary relationship must prove the existence of that relationship by clear and convincing evidence). As a general proposition, the creation of a professional relationship between attorneys and their clients is governed by contract law. *See Church v. McBurney,* 513 A.2d 22, 24 (R.I.1986). "Generally, the relationship of attorney and client arises by reason of agreement between the parties. The relationship is essentially one of principal and agent." *State v. Cline,* 122 R.I. 297, 309, 405 A.2d 1192, 1199 (1979). The existence of such a relationship, however, need not be proven by express agreement; rather, the conduct of the parties also may establish an attorney-client relationship by implication. *See id.* And where the advice and assistance of the attorney are sought and received in matters pertinent to the attorney's profession as a lawyer, such a relationship can still arise even in the absence of an express agreement. *See id.*

Here, the trial justice found that Petrarca failed to establish the existence of any attorney-client relationship with DiLuglio "for purposes of this transaction;" that is, for the purposes of DiLuglio becoming a 20 percent minority shareholder in Waldlum, the corporation that not only owned the property but also, after PAB's incorporation, all of PAB's stock. In so doing, the trial justice found that Petrarca subjective-

ly had considered DiLuglio his attorney from 1969 until 1988, but she found that belief to be "neither credible nor reasonable." Furthermore, the trial justice noted DiLuglio's testimony that, before the 1982 Waldlum acquisition and PAB incorporation, DiLuglio had represented Petrarca as his lawyer on only one earlier occasion: the 1969–1970 federal criminal matter that was dismissed.[10] The trial justice also observed that several other attorneys had represented Petrarca during this time span. Most importantly, she found—

> "the defendant [Petrarca] was *never billed* by DiLuglio for legal representation arising out of PAB's incorporation and in fact was *represented by independent counsel* at the Waldlum closing. This Court finds that the defendant [Petrarca] has failed to establish that an attorney/client relationship existed *between himself and Mr. DiLuglio for the purpose of this business transaction.*" (Emphases added.)

In so deciding, the trial justice did not address whether an attorney-client relationship between DiLuglio and Petrarca had continued and been maintained since 1969 up through the acquisition of Waldlum's stock and PAB's creation. Instead, she limited her finding to the existence of an attorney-client relationship "for the purpose of this business transaction." As a result, defendants contend that she unduly limited the relevant time frame and circumstances that would have established the existence of an ongoing attorney-client relationship between these parties.

The trial justice's finding that Petrarca's belief about DiLuglio serving as his personal attorney was "neither credible nor reasonable" is entitled to great deference. With respect to determinations of credibility, "[t]he question of who is to be believed is one for the trier of fact." *Rodriques v. Santos,* 466 A.2d 306, 312

---

**10.** In 1987 (five years after the transaction in issue) DiLuglio had represented Petrarca personally in a dispute arising from home-improvement work at Petrarca's residence.

(R.I.1983). Here, Petrarca was a convicted felon whose credibility at trial was severely impeached if not destroyed by the inconsistencies between his sworn testimony and the documentation he signed acknowledging DiLuglio's status as a shareholder. However, in limiting the relevant inquiry to the relationship between Petrarca and DiLuglio "for the purpose of this business transaction," we are also of the opinion that the trial justice not only misconceived and overlooked material evidence, but also that she failed to give the requisite conclusive weight to DiLuglio's judicial admission in his amended complaint that he provided legal services "of a professional nature to said corporation [PAB] since 1982" in connection with the same transactions whereby he acquired an equity ownership interest in Waldlum and, consequently, indirectly in PAB. Most significantly, the trial justice ignored the evidence that, by his own admission, DiLuglio had performed legal services for defendant PAB "for the purpose of this business transaction"—namely, the acquisition of Waldlum's stock by Petrarca and DiLuglio and the organization of PAB as Waldlum's wholly owned subsidiary. Indeed, based solely upon what DiLuglio has admitted, the evidence was simply irrefutable that DiLuglio provided legal services on behalf of both Waldlum and PAB, and thereby entered into and maintained an attorney-client relationship with these entities "since 1982," not only for the purposes of their change in ownership (in the case of Waldlum) and incorporation (in the case of PAB), but also for the purposes of advising them in connection with their organization, capital structure, corporate governance, and subsequent operations, as these entities engaged in their respective businesses. Thus, even after giving full credence to the trial justice's finding that no attorney-client relationship existed between DiLuglio and Petrarca personally at any time relevant to the matters at issue here, we hold that the judicially admitted existence of an attorney-client relationship between DiLuglio

and PAB gave rise to DiLuglio's owing to this entity the duties that any attorney owes to a corporate client with whom he or she enters into various business transactions in circumstances like these in which the attorney is both an investor in and a lawyer to the business.

"A judicially admitted fact is conclusively established." *Martin v. Lilly,* 505 A.2d 1156, 1161 (R.I.1986). That is, such an admission removes that fact from the controversy, and obviates the need of one party to produce evidence concerning the fact. *Id.* It also precludes the pleader who admitted the fact from challenging it later during the lawsuit in which it has been admitted. *Id.* In this case, DiLuglio admitted in paragraph 16 of his amended complaint:

> "16. Plaintiff has provided goods and *performed services of a professional nature to said corporation [PAB] since 1982* including the advancement of fees and costs. Defendant contends a payment of $200 weekly later increased to $250 per week was a distribution of profits to the Plaintiff. *Plaintiff never received any payment for these * * * legal and other services to Defendant.* Defendant argues Plaintiff is not entitled to payment for these * * * *legal* and other *services.*" (Emphases added.)

Additionally, in his brief to this Court, DiLuglio effectively admitted that he was PAB's attorney for purposes of the business transactions at issue here. He stated:

> "[t]he final 'evidence' of an attorney-client relationship that [Petrarca] presents is Paragraph 16 of the Amended Complaint, that notes that *legal services* were provided *to the corporation since 1982. This evidence is beside the point.* While it is true that Plaintiff did assist in the incorporation of PAB in December, 1982, this was more than a month after the closing and the parties' business deal. By this point, Plaintiff and [Petrarca] were co-venturers, and Plain-

tiff was contributing his skills to their joint enterprise." (Emphases added.)

We do not agree that "[t]his evidence is beside the point." Although DiLuglio's legal services on behalf of Waldlum and PAB began before PAB's incorporation, this fact did not prevent DiLuglio from retroactively entering into an attorney-client relationship with the legal entity that he brought into existence, nor did it excuse him from making the requisite disclosures and obtaining the necessary consents from his corporate clients via their controlling shareholder (Petrarca) that were conditions precedent to his participation as both a lawyer and businessman in these transactions. The trial justice focused solely on the alleged absence of a personal attorney-client relationship between DiLuglio and Petrarca and overlooked the legal services DiLuglio provided to both of these close corporations—not just during the short period after Waldlum's acquisition and before PAB's incorporation, but also thereafter ("since 1982") and the consequent duties he owed to these corporations as his clients. Thus, the judicial admission in DiLuglio's amended complaint was hardly "beside the point." Instead, this evidence conclusively established that the professional services he provided to PAB were those of an attorney working on behalf of his corporate client.

Moreover, the evidence of DiLuglio's provision of legal services to the corporations that he invested in was not limited to the admission in his amended complaint. When the parties were attempting to resolve this dispute, DiLuglio created a document entitled, "Legal Fees [and] Personal Services due and owing." This document itemized various professional and personal services that DiLuglio said he had performed for Waldlum and/or PAB in connection with Waldlum's acquisition and PAB's organization, incorporation, and subsequent operations. On redirect examination, DiLuglio explained the items on the list. For each item, he described what services he had performed, and whether the work occurred before or after 1985, when DiLuglio's term as Rhode Island's Lieutenant Governor ended. Among the items on this list showing DiLuglio's legal services on behalf of Waldlum and/or PAB and the purported legal fees that were due to him on account of these services at the time of Waldlum's 1982 acquisition and PAB's incorporation were the following entries:

"1. Handled closing of sale of Prop. from Waldlum Realty, Inc. $250.00.[11]

"2. Coined names North American Auto Sales; [North American] Leasing Ltd., filed for use as fictitious names $1,500.00.

* * *

"Legal: 5. Filed for and received on behalf of P.A.B. D/B/A North American Auto Sales a used car business and 8 sets of Dealer Plates * * * $1,500.

"Legal: Negotiated purchase of land at Silver Spring St. from Frank Corrente—closed sale and advanced $20,000.—$750.00." [12]

According to DiLuglio's trial testimony (and in contradiction to his contention that others had performed all of this legal work), all of the above-specified services that he had designated as "legal" and that he had performed for PAB during 1982–1985 were those of a mere "business partner" as opposed to PAB's attorney because "anybody can do it." Nevertheless, DiLuglio himself, whose law practice involved "lots of corporate advice" and who "did a lot of [corporate acquisitions]," la-

11. At trial, DiLuglio claimed that Tallo actually performed this service.

12. During his redirect examination at trial, DiLuglio *attempted to disclaim* negotiating this purchase of land ("I found out I didn't do that"), in direct contradiction to his prelimi-nary-draft list. Instead, he claimed that John Capaldi, Jr., another attorney and friend with whom he shared office space, actually performed this work. He admitted, however, advancing the $20,000.

beled this work as "legal" services when he prepared this document and when he caused his amended complaint to be filed. Although the trial justice found that DiLuglio's actions did not amount to legal representation of Petrarca personally, she did not make any finding whatsoever concerning whether (as DiLuglio admitted in his amended complaint) he had performed legal services on behalf of PAB.

Therefore, regardless of the trial justice's finding that no attorney-client relationship existed vis-à-vis Petrarca, DiLuglio's above-specified services were further proof of a business lawyer serving as an attorney for PAB, if not also for Waldlum, its parent corporation.

**B.** *The Duties DiLuglio Owed the Corporate Defendants and the Ramifications of these Duties*

 Having concluded that, by his own admissions, DiLuglio served as an attorney for PAB, we now discuss the duties he owed to PAB based upon that relationship. The attorney-client relationship is "one of mutual trust, confidence, and good will," in which the attorney "is bound to * * * the most scrupulous good faith." *Peirce v. Palmer*, 31 R.I. 432, 450, 77 A. 201, 209 (1910); *see also Vallinoto v. DiSandro*, 688 A.2d 830, 844–45 (R.I.1997) (Flanders, J., dissenting) (citing cases from other jurisdictions), *and* Ethical Consideration 4–1 (referring to the fiduciary nature of the relationship in the context of confidences and secrets). Thus, when an attorney takes an ownership interest in a close corporation while simultaneously acting as that corporation's attorney, the attorney owes a fiduciary duty to inform the client corporation, through the board of directors or other controlling party, entity, or representative of the corporation, of the differing interests that exist among the various constituents of the corporate entity and of the existing and potential conflicts of interest that result when an attorney for a close corporation becomes a minority shareholder in that entity. And because a corporation is a legal entity separate from its shareholders, directors, and officers, the general rule is that an attorney who represents a corporation owes the duties enumerated in the relevant code or rules of professional responsibility to the client corporation and not to its officers, directors or any one shareholder. *See* DR 5–104(A) and Article V, Rule 1.8(a) of the Supreme Court Rules of Professional Conduct.[13]

Here, DiLuglio failed to provide full disclosure to Petrarca, in his capacity as the controlling shareholder and director of both Waldlum and PAB, of the individual and corporate parties' "differing interests" if DiLuglio were to become and remain a minority shareholder in Waldlum and if Waldlum were to become and remain PAB's sole shareholder. Moreover, he

---

**13.** Rule 1.8(a) of the Supreme Court Rules of Professional Conduct now sets forth the duties an attorney must follow when entering into a business transaction with a client. Rule 1.8 provides:

"**Conflict of interest: Prohibited transactions.**—(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto."

Rule 1.7(b) provides:

"A lawyer shall not represent a client if the representation of that client may be materially limited * * * by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

failed to obtain his corporate clients' written consent (through Petrarca, their sole director and majority shareholder) before and, in the case of PAB, after consummating these transactions. Consequently, DiLuglio breached his fiduciary and professional duties to PAB and to Waldlum.

By taking and holding a minority shareholder interest in Waldlum and then incorporating PAB as its wholly owned subsidiary in exchange for $25,000—and also by contributing his legal work, an automobile, loans, and other ancillary services—DiLuglio entered into business transactions with the corporate entities who issued the stock in question while he was performing legal services on their behalf in connection with these same transactions. The record indicates that DiLuglio failed to provide the requisite information to PAB (through Petrarca) about the differing and potentially conflicting interests between Petrarca as majority shareholder of Waldlum and DiLuglio as minority shareholder and lender—differences and conflicts that could have (and ultimately did) arise between them concerning the effect of DiLuglio's acquiring and holding a 20 percent ownership equity interest in Waldlum (and, therefore, indirectly in PAB, Waldlum's wholly owned subsidiary) while at the same time acting as an attorney for these corporations. DiLuglio also failed to disclose the differing interests he would have as a minority shareholder compared with Petrarca's interests as the controlling shareholder and how these differences might adversely impact upon the existing and future operations of Waldlum and PAB. For example, as a minority shareholder seeking to maximize the return on his investment, DiLuglio might want to receive dividends from any net corporate revenues above expenses, whereas Petrarca, as the operator of the business and as controlling majority shareholder, might want to increase his salary or reinvest any profits by expanding the business.

To be sure, no absolute bar precludes attorneys from entering into business deals with their clients. And the record is barren of any suggestion that DiLuglio acted in bad faith or otherwise tried to take unfair advantage of Petrarca. We hold, however, that when attorneys seek or are asked to take an ownership interest in a close corporation while simultaneously serving as that close corporation's attorney, they must heed the applicable fiduciary duties [14] and rules of professional conduct concerning an attorney's entry into business transactions with their clients. As a result, they must, among other things, inform their corporate clients (through the controlling person, board, or other managers of the entity) of the existing and potentially differing interests between the lawyer as minority shareholder and the other various shareholders and corporate constituencies (e.g., the managing shareholder(s), creditors, employees), and obey the concomitant rules pertaining to duties of care and loyalty that shareholders in a close corporation owe to one another. *See, e.g., Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1021 (R.I. 1998). When an attorney-shareholder fails to transmit these disclosures in writing to the client, fails to obtain the client's written consent, and/or fails to provide the client with a reasonable opportunity to seek the advice of independent counsel, the attorney's self-interested transaction will be voidable at the election of the close-corporate client within a reasonable time after the client learns or should have learned of the material facts—even if the transaction is economically fair to all concerned. But if

---

**14.** These include the duties of care and loyalty that shareholders owe to one another in close corporations that are akin to those of partners in a partnership. *See A. Teixeira & Co. v. Teixeira*, 699 A.2d 1383, 1387 (R.I.1997). They are bound by the duty of "utmost good faith and loyalty." *Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1021 (R.I.1998) (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)).

the client fails to act promptly or ratifies the transaction after discovering the material facts, then equity will not void the transactions unless the terms of the arrangement are so economically unfair or the client is so relatively unsophisticated that equity will not allow the lawyer's misdeeds to stand uncorrected.

Of special significance to this case is the fact that DiLuglio caused PAB to become a wholly owned, corporate subsidiary of Waldlum, which was itself a close corporation 80 percent owned by Petrarca and 20 percent by DiLuglio. We hold that DiLuglio's admitted status as PAB's lawyer "since 1982" imposed a duty upon DiLuglio to (1) inform "the entity" through its controlling representative (Petrarca) of their differing interests as majority and minority shareholders in Waldlum and the consequent present and future conflicts of interest that could arise by virtue of the lawyer's proposed acquisition and maintenance of a minority-shareholder position in the entity that controlled the client's business; and (2) advise PAB and its corporate owner, Waldlum (through Petrarca) of their need to seek and obtain independent legal counsel in connection with DiLuglio's proposed acquisition and maintenance of an ownership interest in these close corporations; and (3) obtain PAB's written consent, through Petrarca, its controlling shareholder (via Waldlum) and manager, to the proposed Waldlum stock acquisition and PAB's incorporation as a wholly owned Waldlum subsidiary.[15]

For all practical purposes, this meant DiLuglio had a duty to disclose to Petrarca the terms on which he proposed to become a Waldlum shareholder and then to incorporate PAB as a wholly owned Waldlum subsidiary and how this corporate structure might impact upon, for example, Petrarca's fiduciary responsibilities owed to DiLuglio as a minority shareholder, the levels of Petrarca's future compensation versus the declaration of dividends, the distribution and allocation of any corporate profits, and the sharing of any liabilities or losses from PAB's business. Because Petrarca was the only person within these corporations who stood in a position of controlling authority, he was the only one who could have given effective consent to these business arrangements with DiLuglio. Thus, DiLuglio should have provided full disclosure in writing of his proposed shareholder status and its ramifications to Petrarca in the latter's capacity as PAB's sole proposed director, Waldlum's majority shareholder, PAB's manager, and, for all practical purposes, to Petrarca as the controlling representative of both Waldlum and PAB. Although PAB was not yet incorporated when DiLuglio was required to make these disclosures and to obtain these consents, Petrarca, as the prospective controlling owner of both Waldlum and PAB, was still capable of approving these transactions subject to later ratification by the entities themselves after completion of the proposed stock acquisition and PAB incorporation. Thus, DiLuglio should have advised Petrarca in writing to obtain independent legal counsel before deciding whether to consent to these arrangements and, thereafter, he should have obtained Petrarca's written consent before consummating these transactions. But he failed to do so.

Other jurisdictions have recognized that business transactions between an attorney and a client may be voidable at the election of the client, see, e.g., Tyson v. Moore, 613 So.2d 817, 823 (Miss.1992), depending on (1) whether the attorney has made full disclosure of all relevant information in his or her possession; (2) whether the consideration was adequate; and (3) whether the client was informed about the need and then given the opportunity to seek independent counsel before completing the

**15.** Furthermore, Rule 1.13(a) of the Supreme Court Rules of Professional Conduct provides: "**Organization as Client.**—(a) A lawyer employed or retained by an organization represents the organization through its duly authorized constituents."

transaction. *See Security Federal Savings and Loan Association of Nashville v. Riviera*, 856 S.W.2d 709, 714 (Tenn.Ct.App. 1992). Also relevant is whether the client was a sophisticated businessperson or business entity. *See also Matter of Palmieri*, 76 N.J. 51, 385 A.2d 856, 860–61 (1978).

When an attorney fails to comply with one or more of these responsibilities, the transaction may be voidable at the election of the corporate client—even if the transaction is considered economically fair to all parties—provided the client acts to undo the transaction within a reasonable time after it learned or should have learned of the pertinent facts.[16]

## C. Estoppel of the Right to Declare the Transaction Void

Notwithstanding DiLuglio's breach of his fiduciary responsibilities, the uncontradicted expert testimony established that, far from DiLuglio's taking an unfair economic advantage of Petrarca, the $25,000 he advanced was actually a poor and a risky investment for him because he received only a 20 percent equity position in return. David Quigley, an expert in the financing of close corporations, testified that usually an investor's ownership interest in a close corporation controlled and managed by another individual should at least equal the percentage of his or her pro rata contribution to the enterprise's startup capital requirements. But even after this corporate-financing expert took into account Petrarca's contribution of his skills and labor—his so-called "sweat equi-

ty"—DiLuglio's initial capital contribution constituted 41.8 percent of the total new money that Petrarca required at startup to acquire Waldlum and to begin operating PAB. Thus, because he received only a 20 percent-ownership interest in return, DiLuglio's capital contribution was less than the usual equity stake that an investor would typically expect to receive in these circumstances. Further, Petrarca was sophisticated when it came to business transactions and to dealing with attorneys and corporate entities. Indeed, the trial justice found that Petrarca was an experienced businessman who was familiar with attorneys and commercial transactions of this kind.

Moreover, despite Petrarca's claims to the contrary, the record reveals that Petrarca eventually obtained full knowledge that DiLuglio had not merely loaned him $25,000, as Petrarca had claimed, but rather had invested in Waldlum and PAB as a co-owner of these companies, and thereby obtained for himself a 20 percent equity stake in these corporations. Thus, for example, in 1986, Petrarca consulted with an accountant and tax attorney to restructure PAB as a "Subchapter S" corporation, a change that eventually resulted in both his and DiLuglio's direct ownership of the PAB stock formerly owned by Waldlum. Petrarca's conduct in connection with and following the consummation of these transactions—including his repeated written acknowledgments of DiLuglio's minority shareholder status as reflected in document after document that he signed in year after year[17]—

---

16. Even though violations of the rules of professional conduct cannot be used to establish a cause of action or to create any presumption that a legal duty has been breached, the violation of a professional rule may be relevant in determining whether a client may void a transaction on the grounds that the lawyer breached his fiduciary responsibilities. The Supreme Court Rules of Professional Conduct, Art. V, state in the preamble (scope):
 "Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been

breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

17. The evidence established that Petrarca's parents had executed a one-paragraph stock assignment form showing that DiLuglio received 200 shares of Waldlum stock. In 1983, Petrarca himself signed the stock certificates that Waldlum issued to DiLuglio. These certificates evinced DiLuglio's 20 per-

amounted to a ratification and implied retroactive consent to DiLuglio's ownership interest.

Accordingly, while DiLuglio breached his duty to disclose fully the ramifications of his investment in Waldlum and PAB and to obtain via Petrarca their written consent to these transactions, the undisputed evidence showed that DiLuglio's stock holdings were economically fair not only to Waldlum and PAB, but also to Petrarca, who repeatedly affirmed DiLuglio's stock ownership. Therefore, defendants were estopped from seeking to void this arrangement so long after they had obtained knowledge of and repeatedly confirmed DiLuglio's minority shareholder status in Waldlum, PAB's status as a wholly owned Waldlum subsidiary, and DiLuglio's status as a de facto and then an actual minority stockholder of PAB.

If, upon discovering DiLuglio's 20 percent equity holding in Waldlum and upon learning that DiLuglio had structured the Waldlum acquisition such that he would end up owning not only 20 percent of Waldlum but also effectively 20 percent of PAB's shares, Petrarca had acted promptly to void these arrangements based upon DiLuglio's failure to obtain defendants' informed consent, we have little doubt but that he would have been entitled to obtain such relief notwithstanding the economic fairness of the transaction to all concerned. *See, e.g., Point Trap Co. v. Manchester*, 98 R.I. 49, 54, 199 A.2d 592, 596 (1964) (holding that "where one standing in a fiduciary relationship deals with himself by purchasing from or selling to the trust, the trans-

action does not acquire validity because the price is fair"). But here, in contrast to *Point Trap*, Petrarca and PAB ultimately learned of the relevant facts, including DiLuglio's minority shareholding status in Waldlum and Waldlum's ownership of PAB. Yet they took no timely action to void these transactions, waiting almost six full years before asserting that the transaction was voidable based on DiLuglio's violation of his professional and fiduciary responsibilities. And they sought to do so only after DiLuglio sued to dissolve PAB for Petrarca's alleged fraud, waste, and misappropriation of assets and only after Petrarca and PAB had obtained independent legal advice and reorganized PAB as a "Subchapter S" corporation that would be directly owned, in part, by DiLuglio. Furthermore, Petrarca contended that he was entitled to void DiLuglio's ownership interest based solely upon an assertion that DiLuglio had served as his personal attorney in connection with the challenged transactions. Indeed, despite DiLuglio's judicial admissions establishing his status as PAB's attorney, defendants never argued—even on appeal—that DiLuglio's PAB shareholding should be voided on that basis.

As a result, having failed to raise this argument with the trial justice, having acquiesced repeatedly in DiLuglio's equity holdings, and having ratified otherwise voidable transactions, Petrarca and PAB have waived any claim that DiLuglio's status as an attorney for PAB entitled defendants to void his status as a PAB stockholder. Because of the economic fairness

---

cent-ownership interest in Waldlum. And in 1986, when PAB elected to be treated as a "Subchapter S" corporation, Petrarca signed Internal Revenue Service Form 2553 that acknowledged DiLuglio's 20 percent-ownership interest in PAB. Even the minutes of the special meeting about PAB's 1986 change to "Subchapter S" corporation status—signed by Petrarca as president of PAB—specifically recited that, "John Petrarca and Thomas DiLuglio, [are] the holders of all issued and outstanding shares of the Corporation." Furthermore, annual state and federal tax returns

that PAB's accountant prepared and that Petrarca signed similarly confirmed the 20 percent/80 percent stock-ownership split between DiLuglio and Petrarca. Petrarca even signed the deed to the Silver Spring Street property and it too indicated DiLuglio's 20 percent-ownership interest in the property. Finally, a letter written to DiLuglio from Petrarca's former attorney described the purpose of the weekly $200–250 payments from PAB to DiLuglio as a distribution to him of PAB's "profits."

of these arrangements and Petrarca's relative sophistication and experience as a businessman, he and PAB, the corporation he controlled, therefore were estopped from seeking to negate DiLuglio's status as a shareholder so long after they should have acted to do so if they had wished to avoid these arrangements. *See Olds v. Hitzemann,* 220 Ind. 300, 42 N.E.2d 35, 38 (1942) (stating that "a client who, with full information, has acquiesced in or ratified a transaction with, or transfer to, his [or her] attorney cannot thereafter avoid the same"); *see generally* 7A C.J.S. *Attorney and Client* § 241 (1980) (discussing the ability of attorneys to use equitable defenses to uphold an otherwise invalid transaction with a client). Indeed, when parties sit idly on their known rights, equity will follow their example. *See O'Reilly v. Town of Glocester,* 621 A.2d 697, 702 (R.I.1993) (discussing the equitable defense of laches).

D. *Failure to Discount the Value of DiLuglio's Shares*

■ On January 13, 1997, the trial justice adopted the findings of a special master whom she had appointed to determine the value of DiLuglio's PAB shares. The special master concluded that "the value of 100% of the common stock of PAB at [the date DiLuglio filed the complaint was] $874,000, and therefore, Mr. DiLuglio's 20% interest is $174,800."

In determining the value of DiLuglio's shares, the trial justice refused to allow for any reduction based upon PAB's status as a close corporation that had no readily available market for the sale of its shares. As a result, Petrarca asserts that the special master should have applied a $150,000 discount to the overall value of these shares and the trial justice should have allowed this discount. We disagree.

As the trial justice correctly noted, the sale of this block of minority stock was assured because a known and qualified buyer (Petrarca) existed to purchase DiLuglio's PAB shares. Hence, the court properly refused to consider that these shares lacked a controlling value or a readily available market for their sale. As we stated in *Charland v. Country View Golf Club, Inc.,* 588 A.2d 609, 613 (R.I. 1991), "[w]e * * * adopt the rule of not applying [a minority discount or] a discount for lack of marketability in § 7–1.1–90.1 proceedings." We discern no basis to distinguish the pertinent facts in this case from those in *Charland.* Therefore, we refuse to overrule the trial justice's decision on this point. And because the remaining issues relating to the valuation of PAB's stock were within the sound discretion of the trial justice, we will not disturb her handling of them.[18]

E. *The Compounding of Interest on the Purchase Price of DiLuglio's PAB Stock*

■ Two months after the trial justice adopted the special master's findings concerning the valuation of DiLuglio's PAB shares, the trial justice ruled on the rate and method of computing interest on this stock purchase price and on the method of payment to be incorporated into the judgment. Petrarca contests the trial justice's award of compound interest.

■ Section 7–1.1–90.1 incorporates the procedure set forth in § 7–1.1–74 to "determine the value of the shares" but not to determine what rate or method of interest computation should be used and

---

18. This encompasses DiLuglio's contention that he was entitled to a valuation of his shares that included his non-distributed share of PAB's profits from the date of filing his complaint until the date of Petrarca's election to purchase. The clear language of G.L.1956 § 7–1.1–90.1 states that such shares shall be valued "as of the close of business on the day on which the petition for dissolution was filed." Thus, PAB's post-filing profits should not have been incorporated into the valuation of his shares. Rather, any entitlement on DiLuglio's part to share in such profits was part of his misappropriation and misconduct claims against Petrarca that failed when DiLuglio neglected to introduce any evidence to substantiate such claims and when the trial justice found that Petrarca's conduct in this regard fell within his business judgment.

then added to the purchase price of the shares. Therefore, the trial justice erred in concluding that § 7–1.1–74(f), which then provided that "[t]he judgment shall include an allowance for interest at the rate of interest the court may find to be fair and equitable in all the circumstances," [19] authorized her to award compound interest. In contrast to this "fair and equitable" language in § 7–1.1–74(f), the applicable version of § 7–1.1–90.1 stated simply that "[t]he petitioner is entitled to interest * * * on the purchase price of the shares * * *." Thus, the trial justice should not have based her interest award upon an equitable rate of interest per § 7–1.1–74. Rather, § 7–1.1–90.1 limited the use of the procedures in § 7–1.1–74 solely to determine the purchase price (that is, their fair value) of the shares, but not in ascertaining what "interest on the purchase price of the shares" shall be awarded under § 7–1.1–90.1.

In contrast to § 7–1.1–74, § 7–1.1–90.1 is silent on both the rate and the method of the interest computation to be used after determining the purchase price of the shares. Although the trial justice believed that the use of compound interest was within her discretion in equitable proceedings generally, based upon her reading of *Chokel v. First National Supermarkets, Inc.*, 421 Mass. 631, 660 N.E.2d 644 (1996), and *Bogosian v. Woloohojian*, 882 F.Supp. 258 (D.R.I.1995), we hold that this decision as applied to § 7–1.1–90.1 proceedings was erroneous.

Instead, we agree with the First Circuit Court of Appeal's decision in *Bogosian v. Woloohojian*, 158 F.3d 1 (1st Cir.1998). There, the First Circuit correctly assumed that this Court would not interpret Rhode Island law to allow an award of compound interest in § 7–1.1–90.1 election-to-purchase proceedings. *Bogosian*, 158 F.3d at 8. The statute simply does not authorize such a departure from the usual rate and method of calculating interest on judg-

ments in civil actions. *See* G.L.1956 § 9–21–10 (requiring 12 percent per annum interest to be included in civil money judgments and making no mention of compounding interest). Indeed, "[t]his [C]ourt has held that because the right to receive interest on judgments was unknown at common law as it is a right created by statute, the [C]ourt will strictly construe any statute that awards interest on judgments so as not to extend unduly the changes enacted by the [L]egislature." *Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 451 (R.I. 1994) (quoting *Gott v. Norberg*, 417 A.2d 1352, 1357 (R.I.1980)). Furthermore, we stated in *Clark–Fitzpatrick*, that "[b]ecause we are strictly construing the statute [awarding prejudgment interest], we should avoid reading anything into the statute by implication." *Id.* at 452.

As the First Circuit noted in *Bogosian*, before the District Court's decision in that case, "no Rhode Island court had allowed compound prejudgment interest under any statute that did not specifically authorize [it]." *Bogosian*, 158 F.3d at 8. Just as the First Circuit foresaw in *Bogosian*, we disfavor compounding the interest on monetary awards in a judgment when the Legislature has not specifically authorized it. *See id.* at 8–9. Therefore, the interest award should have been at the rate of 12 percent simple interest per annum, which construes this statute as consistent with the usual rate and method of calculating interest under § 9–21–10 (establishing the 12 percent prejudgment rate of interest for civil money judgments).

## II

### DiLuglio's Appeal

A. *The Denial of DiLuglio's Misappropriation, Fraud, and Other Misconduct Claims*

DiLuglio claimed that Petrarca had misappropriated corporate assets and improp-

---

19. The General Assembly recently amended § 7–1.1–90.1 to provide expressly that a shareholder shall be entitled to interest on

any buyout price "at the rate on judgments in civil actions." *See* P.L.1999, ch. 474, § 1.

erly refused to permit DiLuglio to inspect defendants' corporate books and records in violation of § 7–1.1–46(b). The trial justice, however, found no evidence of any misappropriation, no showing of any waste of corporate assets, and no proof of any violation of § 7–1.1–46. DiLuglio does not dispute that he failed to introduce any evidence to establish these claims. Rather, he contends that the trial justice ruled against him on these assertions notwithstanding an oral arrangement among the parties and the court to bifurcate these issues from the other claims and to try them later. To this end, DiLuglio suggests that he was prepared to present ample evidence of misappropriation, waste, denial of access to corporate records, and fraud but the trial justice's ruling decided all the substantive issues after the first phase of the trial without giving him the chance to do so.

Although Rule 42(b) of the Superior Court Rules of Civil Procedure grants a trial justice broad discretion to separate the issues at trial, (stating that "the court * * * may order a separate trial * * * of any separate issue or any number of * * * issues"); *see also State v. Martinez*, 651 A.2d 1189, 1196 (R.I.1994) (holding that "the decision concerning whether a bifurcated trial should be held rests solely within the discretion of the trial justice"), our review of the record reveals no such court ruling or agreement among counsel and the court.[20]

 We have stated previously that "stipulated agreements [must] be placed on the record or * * * be reduced to an agreed-upon writing [to ensure] that the agreement itself does not become a source of further controversy and litigation." *E.W.H. & Associates v. Swift*, 618 A.2d 1287, 1288–89 (R.I.1993). Here, Petrarca contested DiLuglio's opening statement that referred for the first time on the

record to the alleged agreed-upon issue bifurcation. Indeed, his attorney stated specifically that "[i]t's my position all the legal claims should be dispensed within [*sic*] this proceeding." DiLuglio's counsel did not move for a separate-trial order at any time thereafter, nor is there any other indication in the record of any such agreement.

At the close of DiLuglio's case, he attempted to "rest conditionally," but after Petrarca objected, he then rested outright. Thereafter, both parties argued extensively to the court about whether any pretrial agreement had been reached in chambers and in the presence of the trial justice to bifurcate the determination of certain claims and/or issues. DiLuglio's attorney stated, "Absolutely we did not bring in any evidence of misappropriation because that is not what your Honor is considering. We decided we would try the case in stages." In response, Petrarca's attorney declared, "I made no agreement. Plaintiffs went ahead with their case. They did what they did. * * * If your Honor has any other recollection, you know, I would be happy to hear that. But I do not remember agreeing to that." After hearing both arguments, the trial justice directed defendants to proceed solely on the issue of whether DiLuglio was in fact a shareholder because evidence directed to that claim was the only evidence that DiLuglio had presented.

Finally, at the close of defendants' case, the court stated: "Well, for whatever reason, we all wound up on the wrong track or on dissimilar tracks. The fact is that [the case has] been tried a certain way." Apparently agreeing with defendants' attorney that no bifurcation agreement ever existed or at least was never agreed upon in her presence, as provided for in Rule 1.4 of the Superior Court Rules of Practice, the court made its decision, holding that

---

20. Rule 1.4 of the Superior Court Rules of Practice provides:

"**Agreements.** All agreements of parties or attorneys touching the business of the court

shall be in writing, unless orally made or assented to by them in the presence of the court when disposing of such business, or they will be considered of no validity."

DiLuglio failed to prove any misappropriation, wrongful denial of access to corporate records, waste of assets, or fraud. Because the record supports this conclusion, we agree with the trial justice on this point and affirm the court's judgment dismissing these claims, with prejudice.

## B. *The Validity of the Election to Purchase*

As previously stated, on April 9, 1992, three years after DiLuglio filed his complaint, Petrarca filed an election to purchase DiLuglio's shares pursuant to § 7-1.1-90.1. DiLuglio asserts that this election was invalid because Petrarca improperly conditioned the election upon a judicial determination that DiLuglio was in fact a lawful PAB shareholder. DiLuglio contends that if a shareholder seeks to avoid dissolution by filing with the court an election to purchase, he or she must stipulate that the person or entity from whom the shares are to be purchased is indeed a shareholder. DiLuglio further suggests that a close reading of §§ 7-1.1-90, 7-1.1-90.1, and 7-1.1-91, taken together, reveals that Petrarca's delay in filing the election to purchase should have caused the trial justice to reject it outright. All these contentions, we hold, are meritless, for the reasons that follow.

First, by conditioning his election on DiLuglio's shareholder status, Petrarca was merely holding DiLuglio to his proof in establishing his rightful ownership of PAB's shares, a necessary statutory pre-condition to DiLuglio's initiation and maintenance of his dissolution claim and, therefore, to Petrarca's invocation of his buyout election under the statute. Moreover, the applicable rules of civil procedure allow for the assertion of alternative and hypothetical claims and defenses, *see* Super. R. Civ. P. 8(e)(2), and the rules supersede any statute to the contrary. *See* G.L.1956 § 8-6-2(a). Thus, Petrarca was entitled to condition his election upon DiLuglio's rightful ownership of PAB's shares—subject to the risk that if his position challenging that ownership turned out to be a frivolous one or one taken in bad faith, he would subject himself to sanctions under Rule 11 of the Superior Court Rules of Civil Procedure, including an assessment of attorneys' fees. And given the potentially voidable status of DiLuglio's shareholding in this case, no such Rule 11 claims would have been tenable here.

Second, § 7-1.1-90.1 states that an election to avoid a corporation's dissolution via a stock buyout may be made

> "by filing with the court prior to the commencement of the hearing [to dissolve the corporation], or, in the discretion of the court, at any time prior to a sale or other disposition of the assets of the corporation, an election to purchase the shares owned by the petitioner at a price equal to their fair value."

This language is unambiguous, and we need not look elsewhere in the Rhode Island Business Corporation Act for guidance.[21] The statute provides one

21. Petrarca filed his election to purchase DiLuglio's shares before any hearing on the dissolution claim. In response, DiLuglio filed an objection to the election to purchase. One year later, a motion justice denied DiLuglio's motion to strike the election to purchase. In her decision at the close of the case, the trial justice ordered Petrarca to purchase DiLuglio's shares as an equitable alternative to the option of dissolution. Although the trial justice explained that her order requiring Petrarca to purchase DiLuglio's shares was issued "pursuant to [§ 7-1.1-90.1's] equitable devices to fashion a remedy," § 7-1.1-90.1 mandates that upon a shareholder's timely election to purchase (if the parties cannot agree to the fair value of the shares),

> *"the court shall, upon the giving of a bond * * * stay the* [dissolution] *proceeding and determine the value of the shares,* in accordance with the procedure set forth in § 7-1.1-74, as of the close of business on the day on which the petition for dissolution was filed. Upon determining the fair value of the stock, the court shall state in its order directing that the stock be purchased, the purchase price and the time within which the payment is to be made * * *."* (Emphasis added.)

or more shareholders with an absolute right to file an election to purchase with the court before the dissolution hearing commences. Furthermore, the statute authorizes one or more shareholders, in the discretion of the court, to file a buyout election "at any time prior to a sale or other disposition of the assets of the corporation." Section 7–1.1–90.1. Here, because Petrarca filed his election "prior to the commencement of the [dissolution] hearing," and because "the parties [were] unable to reach an agreement as to the fair value of the shares" § 7–1.1–90.1, the Superior Court was required (upon the posting of a bond) to stay the dissolution proceedings and to proceed with the valuation of DiLuglio's PAB stock. Indeed, it is only when an election has been filed *after* the dissolution hearing has commenced, and *before* the sale or disposition of assets, that the trial justice is afforded any discretion to deny an election to purchase that has been tendered during this period. *See id.* Therefore, Petrarca's election to purchase was timely and the trial justice correctly rejected DiLuglio's challenge to its validity.

### C. *The Date From Which Interest Runs on the Shares' Purchase Price*

DiLuglio next argues that the trial justice erred in removing approximately three years of interest from the judgment she entered for the purchase price of DiLuglio's PAB shares when she subsequently "corrected" the judgment to award interest as of the date of Petrarca's election to purchase (1992) rather than as of the date DiLuglio filed his petition for dissolution (1989). Section 7–1.1–90.1 states unequivocally that interest on the purchase price of the stock is to run "from the date of the filing of the election to purchase the shares * * *." Notwithstanding the clarity of this statutory provision, DiLuglio argues that the trial justice's corrected judgment that conformed the interest award to this statute—after defendants moved for such a correction pursuant to Rule 60(a) of the Superior Court Rules of Civil Proce-

dure—was an abuse of her discretion. Rule 60(a) allows a trial court to correct clerical mistakes "at any time of its own initiative or on the motion of any party and after such notice." We have stated that Rule 60(a) may also serve to correct clerical or computational errors in the judgment. *See Providence Gas Co. v. Burke*, 475 A.2d 193, 199 (R.I.1984). Thus, in *Lischio v. Gill*, 704 A.2d 216 (R.I.1997), the judgment contained an incorrect rate of interest. We held that because the rate of prejudgment interest at the time of the entry of judgment was not a discretionary function of the trial justice, the court could amend such a clerical error at any time pursuant to Rule 60(a). *See id.* at 217. Here, Petrarca's election to purchase was filed on April 9, 1992, not on February 7, 1989, when DiLuglio filed his claim for dissolution. Thus, the February 7, 1989, date in the prior judgment was an incorrect date upon which to begin the calculation of interest. As the trial justice stated in her decision on post-trial motions,

"the plain and clear language of the statute evidences that the court's equitable powers do not include the awarding of prejudgment interest or the commencement of the same from a date other than that of the filing of the election. * * * With respect to the commencement date of prejudgment interest in the instant matter, the statute does not afford discretion. The statutory provisions regarding the mandatory commencement date of said interest should have been known by the parties."

We agree with the trial justice, and, therefore, deny DiLuglio's appeal on this point.

### Conclusion

In a 1988 letter to Petrarca, DiLuglio predicted the drastic consequences of this protracted litigation:

"I wanted to avoid an adversarial position, but it is obvious I am forced to that end where nobody wins, but assuredly one loses a great deal more than the

other. I intend to avail myself of the legal process. You will find that much less gentle and understanding than you may have imagined."

Indeed, there was nothing gentle or understanding about how this case has wound its way to an end that neither side can applaud.

In sum, DiLuglio is entitled to $174,800, the value of his 20 percent-ownership interest in PAB stock as of the date of his filing his complaint (February 7, 1989), plus interest at the rate of 12 percent per annum (that is, simple interest), to commence from the date of the filing of Petrarca's election to purchase (April 9, 1992). The other aspects of the parties' appeals are denied in part and sustained in part as indicated above. The case shall be remanded to the Superior Court for entry of an amended judgment in accordance with this opinion.

Justice BOURCIER did not participate.